Good morning, your honors. My name is Melissa Thorm and I am representing the Trade Associations in Southern California Alliance of DOTWs at all case versus USEPA. I'd like to reserve four minutes for rebuttal, if I may. Okay, you need to keep track of your time. Okay, thank you. The case really, the law. In this case, the Clean Water Act and to avoid actions that are not in compliance with the law. The case really started in 2014, challenging EPAs using an orchestrated alternative test procedure or ATP as a new vehicle to avoid rulemaking under the Clean Water Act. But we also in that case included claims and a prayer regarding the TST guidance document that was issued in 2010 as well. And we cited in our briefs some of the language from our initial complaint in that case to show that it was broad enough to seek relief for an order that USEPA and its officers, employees and agents be temporarily and permanently enjoined from mandating the use of the two concentration TST or the use of analytical results obtained by using this non promulgated method for NPDES compliance determination or other Clean Water Act purposes. So that prayer didn't mention the alternative test procedure at all. It was a standalone and there were standalone also allegations in the main body of the complaint. But once the alternative test procedure was withdrawn by EPA in 2015, they argued that the case should be dismissed on mootness grounds because what they saw as the main challenge to the alternative test procedure was now gone and the court granted the mootness order in SCAP one. We asked for reconsideration, which was denied. And then we also asked to amend and were case and relate it back. So given some of the language that were in these dismissal orders, we had hoped that equitable estoppel would be granted because the strict six year interpretation from June of 2010, when the original TST guidance document was issued, had would have run in the mid 2016. And this first case didn't even end until, um, the final denial of the motion to amend was in October of 2016. Council the so that the statute of limitations only becomes an issue if if there's a final agency action that you can challenge. So, uh, like to ask you to start with that. And in particular, um, do I understand your position correctly that the 2010 TST guidance, even though it says it has that disclaimer that it's not legally binding, is it your view that the agency has de facto treated that as if it were a rule? Not initially. So nobody really thought it was much for the first few years, and a lot of people didn't really even know it existed. And then it showed up in 2012 as something that was starting to be used as a rule. And that's what got people concerned about it. And so the original case was filed in 2014. So we found doing Freedom of Information Act request emails, internal emails from EPA, saying that headquarters had told them, Yeah, you can't do what you want to do with this TST using two concentrations, that it's not allowable under the part 136 regulations. And the only way that you could deal with that was to do an alternative test procedure. But in the same email, they recognized that there was no guidance on how to do an alternative test procedure. Before you slip away there, can I just take a step, even go earlier? I just wasn't your brief uses a lot of long sentences that list a lot of verbs, and they're separated by or and sometimes the verbs are very different things. And so I was a little unclear on what some of your positions were. Okay, prior to 2010. So we're talking about under the 95 and 2002. Right? Yes. Was use of the TST test forbidden? It wasn't even known about it wasn't something that was out there in the in the world that people would have used. It wasn't forbidden, then obviously, it was not forbidden. But in the 2002 rules, they specified what statistical options you could use. And there were five of them. And they said you can pick from these five, but you can't stray from those five. I thought they had language that said this wasn't meant to be exclusive. And you could use other methods. No, the language was more they recognize there were other statistical options in the world, but they chose these five. And they gave three reasons why they chose those five. Okay, so they're easy to understand. And you know, I can't I don't have that right. So as of 2002, then, is use of the TST prohibited? Yes, because it's not an approved part 136 method. So in 2010, the EPA announces that you can use the TST, right? Yes, in the guidance document, that it was supposed to be an alternative. And it wasn't clear in that guidance, whether it meant you still did the part 136 methods, but you could do this other statistic and take a look at it and see if you got a different answer. But it was not clear that that would ever be used in any regulatory construct. Well, all that I what I can't understand is, I can understand the argument that the 2002 I'm sorry, 2010 guidance is not final agency action, which is what you say in your brief to excuse you're not challenging it. What I can't understand is if that's not final action, how is the circulating a spreadsheet in 2012? That allows the person using the spreadsheet to use either the TST or any of the prior tests? How does that you keep using expressions like, it's its first use as a rule, the first indication they were treating it as a rule. I don't, it seems to me the big change under your theory is between 2002 and 2010. Not between 2010 and 2012, that you want to make 2012 the big deal, the final agency action. No, we believe that we actually challenge the final agency action in the first scat one case, and that we pled it broad enough under the Iqbal line of cases that it was notice pleading, the court should have ruled that that was a direct challenge in that case. And we asked to amend to make it more clear. But then in that case, the final agency action was definitely the the 2010 guidance. So then the problem became when you file a new case, and now you're in circuit cases, under the ultra vires, that you can extend that six year window if other things happen in that window that affect and crystallize that the problem. And so the problem wasn't that in the four corners of the 2010 TST guidance, because it had this disclaimer saying, we're just putting this out there, we're not going to use it, it's not going to affect anybody's permits or any labs. And then all of a sudden, they issue the spreadsheet, which has the cover sheet, it also was an Excel spreadsheet. So they gave it out to all the states, and said, here, use this run everything through the spreadsheet, and kick out this pass fail answer. But so that's the steps that we're saying, this just to be clear that the steps that you're saying crystallized the 2010 TST are, you've got the spreadsheet in 2012, and then this email in 2015. Is there something else, or is that the universe? Well, there was a permit issued to the Orange County Sanitation District, which was a joint EPA and regional water board permit. So in California, the regional water boards are generally who issues the NPDES permits, although the state water board has authority to do that as well. In this case, it was a joint permit between EPA and the regional board for Orange County Sanitation District, who is one of SCAP's members. And so that was one of the first places that we learned about that. But how does that, the permit, the permit used the TST, but is there anything in the permit that indicates that they were requiring the TST because they thought it was, that they had to? Well, they think it's superior, and the bigger wrinkle in California law is that that discharges to the ocean, and the ocean plan specifies that you're supposed to use NOAC, which is one of the part 136. So they actually have two different options for endpoints that you can use. One is the IC-25, which is the inhibition concentration at 25% effect, and the other one is a no effect concentration, observable effect concentration. Those are the only two endpoints allowed in part 136, and the ocean plan actually picks one of those and says for ocean discharges, you must use NOAC. And this permit came out and said, nope, we're using TST. So they went off the reservation as far as what the 2002 rule allows. And we put a copy of the table that's from the regulations on page five of our reply brief, and this is what the rule says. It's a parameter for chronic toxicity, and the units are NOAC or IC-25% effluent. It doesn't say you can use pass-fail. It doesn't say you can use TST. These are your options, and TST is a totally different thing. So what EPA is doing is saying, yeah, the guidance, either overrule or revise the regulations and not do it through what is required under section 304 of the Clean Water Act, which says that... I just want to nail this down because it just wasn't clear to me from your briefing. So you're not claiming in this litigation that there is an EPA rule or true? No. They're not requiring it in every permit, but they're allowing it as an option that doesn't exist under the regulations. Your beef with the EPA is, as of 2002, the TST was forbidden. In 2010, they changed the forbidding to allow it, and they needed to follow APA procedures to lift the prohibition and allow the use of the TST. Well, not just APA, but under the Clean Water Act itself, that under 304A or 1314, USC section 1314, it says that they shall develop and publish, and from time to time revise, the information related to test procedures. And then also in 304H, they shall promulgate guidelines establishing test procedures for the analysis of pollutants. So they're told how to do this, and they did it in 1995. They did it in 2002. They've three times since 2010 done promulgations to change the Part 136 methods and never put in TST. If they like it so much, they should promulgate it and change Part 136 to actually specify that this can be used. But until they do that, they're off in a different world, regulating by guidance, and it's an underground rule. Please. Just quickly, I just wanted to clarify one thing from your briefing as well. I understand this sort of big picture argument that you're making. Are you also challenging specific permits? Because that wasn't clear to me. It seemed like there were some statements that indicated, yes, you are, and then others saying you're not. Not through this litigation, no, we're not challenging specific permits. Because in California, state permits are issued by the state and get challenged through a state court. And a state court doesn't have the ability to tell EPA to stop pushing the use of the TST because it's outside. So what would have to happen is that you would have to appeal every single permit. And so as a trade association, all the trade associations that I represent, and they represent probably 700 or 800 publicly owned treatment works in California. And to avoid that need to file 800 different state court cases that aren't going to be binding on the next one, the best, most expedient way is to go after EPA who started this. Because but for that guidance and the use of that guidance. Hold on. I guess I'm still not clear. Are you asking us or is part of your case seeking relief to invalidate specific permits? No, because if you invalidate the use of the TST, then that will fall. There are a lot of permits that are in advance that have petitions in advance waiting for a decision here. So if the court were to say it's not OK to use the TST, then all those permits would get reopened. I think I think I'm repeating a question that was asked before, but I just want to be clear on your answer. Your objection is not that you think the agency is requiring use of the TST. Your objection is to the fact that they're allowing it at all. And you think that that's the decision to allow it was invalid. And you want us to say that they can't use it unless they go through rulemaking or something. Is that right? But there is some evidence in some of the emails and we had attached one email from Texas. These shall be reported using 100 percent effluent concentration and negative control expressed in units of US EPA's TST statistical approach pass or fail percent effect. So there is evidence out there that not only are they giving this as an option, which they had in the TST spreadsheet, but they're also telling people you must use this. And the email you just read with the expression the EPA uses, it's strongly recommends that was the EPA's words, I believe, that it started with. And that's that you're quoting from the May 7th email, right? Yes, but it's the it's below the second bullet, it's saying that you have to run the tests through. Part 136, but then it says all compliance monitoring for chronic toxicity shall be reported. That's using that for that specific permit, and that's because the decision was made in that specific permit to use TST. But that's different than saying I noticed in the March 21st email they tell the California authorities you are, quote, able to use and quote the TST despite the withdrawal of the TPA. You if it was required, it would be odd to say you're able to use it. You would say you're required to use it, wouldn't you? Right, so I use this analogy, so if the rules said you can wear black or white, that would be all that you could wear. And what EPA is doing by guidance is saying it's OK to wear yellow. And that's not that's outside of what the rules say. If they want people to be able to wear yellow, change the rule. Right. I think that's what both Judge Miller and I's questions we're probing at to make sure we understand your challenge. To summarize, you're not saying that the EPA has has a national rule that is requiring in each and every permit that TST be used. You're saying that under the 2002 regs or under, I guess, today's regs, the EPA is not allowed to even give the option of using TST. And when they give permittees or permitting authorities the option, they have changed their rules without following the proper procedures under the APA and the Clean Water Act. Am I correct? OK. And I will I will save the rest of my time. All right. Thank you, counsel. We'll hear from the government. Thank you. Good morning. I'm David Gunter from the Department of Justice here on behalf of EPA. Ten years ago, EPA published its guidance recognizing the test receiving toxicity as an appropriate technique to obtain more accurate results from some kinds of water pollution testing. And the plaintiffs want to challenge whether EPA followed the proper procedure when it published that guidance. The district court correctly dismissed that challenge for lack of jurisdiction. And the jurisdictional arguments before the court today really come down to one fact. The 2010 TST guidance was not and has never been binding on anybody. The test for significant toxicity was not forbidden under the 2002 rulemaking or prior to 2010. And the 2010 TST guidance did not require its use. How do we, Mr. Gunter, I can't speak for the other two judges, but I tried reading some of these rules and stuff and I might as well be reading a foreign language. How do I know? Ms. Thorne has just told us that under the 2002 movement of the regs, use of the TST was forbidden. Forbidden. You say not forbidden. How do we tell? That's right. I'll preface my answer and then give you an actual Federal Register site. But the preface is that there are two steps to the process of determining reasonable potential for compliance. One is the actual promulgated test methods from Part 136. That's what Ms. Thorne has held up. The other is a second step where you apply some statistical analysis to the results you get from that data. And that statistical analysis tells you, is your result statistically significant and shows a difference in how your organisms respond to the control sample and the effluent sample that's taken from the point source. Now, the way you know that those are two different things is from the 2002 rulemaking. I'm reading from 67 Federal Register, 69, 964. It says several commenters recommended that EPA approve and use alternative statistical methods. EPA has not included such alternative statistical methods in today's modification because it believes that the statistical methods currently recommended are appropriate and acknowledges that these recommended statistical methods are not the only appropriate techniques. And it says that the manuals, the method manuals referred to in the CFR itself are not the only possible methods of statistical analysis. So it's true that the test for significant toxicity wasn't used for whole effluent toxicity testing really prior to 2010, but it's a known version of statistical analysis. I mean, it's the type of statistical analysis it is, it's been around for a hundred years, and it's been used in other contexts like the FDA. If California had come to EPA and said, we think this is a good idea and we want to do it, then first of all, EPA doesn't allow or deny the state to do that. EPA has the power to object to permits that it thinks are contrary to law. But EPA's failure to object is not a final agency action. But if California had come to EPA and said, we want to do this, what do you think? EPA would have said, well, our regulations don't prohibit you from doing that. So you can do it. Why then? I thought your brief, by the way, was really, really well done. It really was a nice, clear guide to some really complicated stuff. So thank you. I mean, it might be that you fooled us, but I thought the brief was really well done. The one part I just couldn't understand is that if use of the TST is neither prohibited nor required, what's the need for the APT? Why do you need an APT if there's nothing there that's being required? Sure. The reason is the difference that the plaintiffs have pointed out between how the test method is done by the laboratory, the published test method, which does require five concentrations, and the statistical analysis, which only applies the math to two of those concentrations. If you have to do five concentrations, but then in the end, you only use two of them, that's more expensive and more troublesome. And so California was saying, do we really need to do this? EPA understood that since its regulations require five concentrations, if it wanted to vary that requirement, it would have to do it through the alternative test procedure that is laid out in 136.4, I think, rather than 136.3. So as of today, do you have to take the five concentrations, even if you only plan to test two of them? That's correct. That's the result of EPA withdrawing the alternative test procedure. But EPA's regulations, although they require the five concentrations, don't require you to apply the math to any more than two of them. And so as a result, the legal effect of that is that the 2010 TST guidance is not final agency action. I perhaps don't need to read to you the provisions of that guidance that you're already looking at, but it says this document describes what EPA believes is another valid statistical option to analyze valid data. It says regions and their states can still use EPA's TSD approaches. That's the technical support document that pre-existed the 2010 guidance. And so the TST approach could be required by the terms of an individual permit. And as Ms. Thorn has pointed out, there are some permits that require permittees to use the TST as part of the terms of their permit. But in that case, the binding effect does not come from the TST guidance or EPA's position or EPA's policy or recommendation. It comes from the permit itself. Congress wanted challenges to those permits to be expedited. It provided that where a permit is issued by EPA, it has to come to the Court of Appeals within 120 days. It did not contemplate, Congress did not contemplate that 10 years later, we could still be talking about whether a guidance imposes binding requirements or not. If they want to challenge this, they should challenge it in the terms of an individual permit. Counsel, could you address, bearing in mind that this may be relevant to an I thought plaintiffs were making, but maybe they really aren't. Could you address the D.C. Circuit decision in Appalachian Power? Because that seems to me to suggest that you can have a guidance document that by itself might not be a final agency action. But if the agency starts effectively requiring permitting agencies to follow it and to use it in issuing permits, that the people who are subject to the regulatory scheme can then challenge it. So why does that not apply here? Sure. In Appalachian Power, the D.C. Circuit said that if the agency has given states their marching orders and require them to fall in line, then that can be a final agency action. But that's not what has happened here. In fact, permits have been issued, as Ms. Thorm admitted, without using the TST and that use other statistical techniques since 2010. EPA has consistently said in the guidance itself and afterward states can choose the method that they want to use. Another difference is that I don't remember if this was true in Appalachian Power, but certainly in Barrett and Goldbright, the agency had issued a guidance and said, we may base enforcement actions on this guidance, but there are no enforcement actions to be based on the TST guidance or on any of EPA's subsequent positions, except for the terms of a permit. If the TST guidance, I'm sorry, TST technique is required by a permit and plaintiffs want to challenge that, then they can challenge the permit within 120 days in the court of appeals for EPA permits or in the California state courts for state permits. But there's no enforcement action that would be based on anything other than that permit. And so that's the agency action that should be challenged. And suppose, I mean, I think this goes beyond the facts that they've alleged, but just hypothetically, if suppose that the agency had started without announcing its policy, effectively adopted a policy and what we're going to object to any permit that doesn't have, that doesn't use the TST, we're going to, you know, we're going to treat this as, as if it were a binding rule. Would somebody be able to challenge, do those challenges to that have to be, you know, at the level of individual permits or could somebody come in at that point and bring a challenge to the TST? Itself. I want to say that it would still have to be at the level of an individual permit and the hypothetical that you have posed, there's no binding effect on anybody until EPA objects to a permit that a state has tried to, a permit condition that the state has tried to impose. At that point, the permittee might want the condition, the state might want the condition, they can say, we are entitled to that condition. And if EPA says, no, it has to be something else, then you can challenge that. You know, the court issued an order asking us to talk about the Boise Cascade case. And my takeaway from that case is that state courts are competent to adjudicate whether the state has complied with the Clean Water Act, has done, has written its permit conditions in a way that is consistent with the Clean Water Act. And that is EPA's understanding. Those kinds of issues can be litigated in state courts as well. And in Wind River, this court said that an as-applied challenge is adequate to address those kinds of concerns because once it's been decided once, then res judicata will apply to make sure that any other agency decisions that may be affected by the same policy are going to be affected by the court's decision that invalidates that policy in the context of a particular permit. OK, I wanted to ask you exactly that. So to be clear, your view is that if the California State Permitting Authority put the TST into a permit, that the permittee could in state court challenge that condition on grounds that it was inconsistent with the 2002 regulations, for example, that that challenge would be could be made in a state court. Is that right? Yes, we believe so. And obviously, EPA would have an interest in that. Perhaps we would try and participate and share our views with the court on the meaning of federal law. But ultimately, we believe that the state court would be able to adjudicate a question like that when the question is framed as. I'm sorry. And if you lost and, you know, went through the appeal and everything and you lost and the California courts found that requiring the TST was unlawful because it was forbidden under the 2002 regs and you didn't properly amend those regs, then race judicata would click in. So as Miss Thorn was, she was raising the possibility of having to bring 80 different challenges to the same thing. You wouldn't have to. You'd only have to win it the first time. I believe that's right. There's language supporting that result in Wind River. I don't want to take a position here on exactly how preclusive that would be or how broad it would be interpreted. It would depend on the, on the judgment in the case and whether it was based on the particular administrative record for that permit. But yes, that's a legal question that could be decided. And then, you know, there will be precedent that would apply to other permits. And generally EPA would, obviously California as the permitting authority in that case would be bound by it. But, you know, the purpose of the TST guidance is so that EPA can act in its role, coordinating federal and state permitting authorities, trying to make sure everybody is doing the same thing, acting consistently. And so an adverse state judgment like that would potentially be binding on the permitting authority against whom that judgment was rendered. But ultimately EPA would be likely to try and fulfill its role as a coordinator and as a repository of expert information about these permitting issues and would try and resolve it in that way. But that can only happen if the challenge is raised in an appropriate forum. Here, the district court looked at, for example, the 2014 complaint and said, does this complaint fairly raise the question of the validity of the test for significant toxicity? And he concluded based on the complaints and the pleadings that the plaintiffs have filed, that it hadn't. Our view is that plaintiffs never raised this claim until more than six years after EPA issued the 2010 guidance. And as a result, it's time barred. That doesn't mean they're completely out of luck. They still have under Wind River, the possibility of as applied challenges, even after the six year limit for facial challenges, but they have to allege the right kind of claim and they have to allege it in the right form. Here, it's fairly clear that that's a permit challenge. Can they, there was a third option that was discussed in the briefs, which is them petitioning you to, I don't know what it would be, repeal the 2002 guidance on grounds that it was not properly promulgated and so on. And if you deny the petition, then they can seek review of your denial of the petition. Is that also an option available to you? They certainly are entitled to, to make that petition. I think that whether EPA has an obligation to respond to it would depend on what the authority is under which they are petitioning. So some kinds of statutes specifically allow for that and some don't. There's case law in the DC circuit, some of which may be cited in the cases in the DC circuit has been cited, but the one that comes to mind is American Road and Transportation Builders Association, which governs when you can petition for a rule making and then seek review of the denial of that rulemaking. But certainly that is, that's an option that many plaintiffs try and that may be effective. I'll address just for a moment the, the idea of the 2010, I'm sorry, the 2010 guidance, that that was the first time that it could have been known to the plaintiffs that EPA would use the test for significant toxicity as they put it in a regulatory context, that is to make reasonable potential determinations of whether a permit is needed and also compliance determinations of whether a permit has been violated. First of all, at least some parties, interested parties, including NACWCA, the National Association of Clean Water Agencies, which has been a plaintiff in some of these cases, was aware of the 2010 guidance when it was published. They had commented on that because EPA had disseminated it to some stakeholders and said, what do you think about this? But then the 2010 guidance itself says that it can be used to make reasonable potential and permit compliance determinations. That's on page Roman numeral two with the other disclaimers about the guidance not being a binding rule. So the idea that it was not until the spreadsheet was circulated, which is really just a calculator for figuring out how to apply the math of the statistical technique to the results you receive, the idea that that was the first time anybody could ever have known that the test for significant toxicity might be used to make compliance determinations is simply incorrect and is not supported by the record that the plaintiff put before the court. I would be happy to take any further questions that the court has, but unless you do have further questions, I'll just wrap up with this idea. We believe that the TST is a valid statistical approach. We believe it will give us more accurate results. Whether it is consistent with the Clean Water Act, obviously we believe that it is, but  the question that is before the court is whether the plaintiffs have raised those claims using the channels that Congress provided in the APA. The APA says that it allows review for plaintiffs who are alleging action not in accordance with law, and that is exactly what these plaintiffs are alleging. And so they have to abide by the limitations that the APA places on those actions, including the statute of limitations and the proviso that review not otherwise be in effect. A permit challenge would satisfy those requirements, but these plaintiffs are refusing and have steadfastly refused to make a challenge to a particular permit in this action. And so as a result, the district court properly dismissed their claim. Thank you, counsel. You have two minutes, just over two minutes remaining. OK, I just wanted to touch in on some of the things. So one of the issue was what did the rules say about statistical methods? And the rule did say the methods manual state the statistical methods recommended in this manual are not the only possible methods of statistical analysis. They know that there's other statistics out there in the world, but it says the recommended statistical methods described in the method manuals were selected because they are applicable to most of the different toxicity test data sets for which they are recommended. They're powerful statistical tests, hopefully easily, in quotes, understood by non statisticians and amenable to use without a computer if necessary. So they realize that maybe the TST or something like it, which has been used in pharmaceutical applications, are out there in the world, but they chose not to put that in. Now, counsel for EPA says the TST is more accurate. Well, I don't know how that's defined, because when you run the same data through the promulgated methods and the TST, you get different answers. And to me, that means that that is a problem. So on the one side, you could have a test that is promulgated test that says you're fine, there's no violation and you run it through the TST and now there's suddenly a violation. That's a problem. And you're also not able to use the information found in the other five concentrations. There might be useful information in there that that says that you shouldn't rely on this data. It does. The 2002 rules don't prescribe pass fail. They don't use the same approved endpoints. They change the number of samples. And most importantly, it changed the alternative hypothesis from presuming it's not toxic to presuming that it's toxic. And as far as the state court cases, the regional boards say that they're not binding on them and that different regional boards, you'd have to bring cases in each region to get answers. It's the rest you caught. I've been doing this for 30 years in state courts and they do not believe these are binding. You have to bring more cases. Thank you, counsel. Thank both counsel for their helpful arguments and the case is submitted and we are adjourned for the day. Thank you. This court for this session stands adjourned.
judges: Miller, Hunsaker, Schiltz